## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____
                                            :
**MARIA MARQUEZ,**                          :
**EDUIN ARTURO CAMBAR**                      :
**MATUTE, and**                             :
**MILTON FRANCISCO**                         :
**LOVOS MARQUEZ,**                           :
                                            :
    **Plaintiffs,**                    :    **No.: 19-cv-_____**
                                            :
    **v.**                            :
                                            :
**COMMONWEALTH OF**                          :
**PENNSYLVANIA, and**                        :
**TROOPER LUKE MACKE,**                      :
                                            :
    **Defendants.**                    :
_____:

## COMPLAINT

## I.    PRELIMINARY STATEMENT

1.    Plaintiffs in this civil rights action allege that a Pennsylvania state trooper discriminated against them based on their perceived race, color, ethnicity, or national origin in stopping and detaining them for the purpose of investigating their immigration status.

2.    The incident at issue is just one in a much larger pattern and practice of discrimination and unlawful conduct by the Pennsylvania State Police ("PSP") against people based on their perceived race, color, ethnicity, or national origin.

1

3.     These illegal detentions are part of an established pattern of misconduct engaged in by Defendant Luke Macke ("Macke") and other PSP troopers, with the knowledge and tacit approval of their superiors at PSP.

4.     Defendant Commonwealth of Pennsylvania ("Commonwealth") and its agency, PSP, along with supervisory officials, have been deliberately indifferent to patterns of unlawful discrimination that violate the Fourth and Fourteenth Amendments to the U.S. Constitution and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and have failed to take necessary and appropriate steps to curtail the practice.

5.     Plaintiffs Maria Marquez, Eduin Arturo Cambar Matute, and Milton Francisco Lovos Marquez seek to vindicate their constitutional rights to be free from discriminatory and/or groundless stops and unlawful detention on the basis of their perceived race, color, ethnicity, or national origin.  They also seek to vindicate their constitutional right to be free from unlawful prolonged detention by state actors who are prohibited from enforcing federal civil immigration law.  Plaintiffs seek compensation for their harms and losses.

6.     Plaintiffs bring this action against the Commonwealth under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), and against Defendant Macke, under 42 U.S.C. § 1983, for violations of the Fourth and Fourteenth Amendments to the United States Constitution.

## II.    JURISDICTION AND VENUE

7.    This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

8.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events that gave rise to this Complaint occurred in or near Carlisle, Pennsylvania, within the Middle District of Pennsylvania.

## III.   PARTIES

9.    Plaintiff Maria Marquez is a Latina woman who resided in Brentwood, NY at all times relevant hereto.

10.    Plaintiff Eduin Arturo Cambar Matute is a Latino man who resided in Brentwood, NY at all times relevant hereto.  He is Ms. Marquez's partner.

11.    Plaintiff Milton Francisco Lovos Marquez is a Latino man.  He is Ms. Marquez's adult son.  He resided in Brentwood, NY at all times relevant hereto.

12.    Defendant Commonwealth of Pennsylvania is a public entity that receives federal funds and, accordingly, is subject to Title VI.

13.    Defendant Macke was, at all times relevant hereto, employed by PSP as a state trooper.  At all times relevant to this Complaint, Defendant Macke acted under color of state law.  Plaintiffs sue Defendant Macke in his individual capacity.

## IV.   FACTUAL ALLEGATIONS

### a.   The Pennsylvania State Police

14.   PSP is a law enforcement agency established and operating under the laws of Pennsylvania.

15.   The immigration "removal process is entrusted to the discretion of the Federal Government." *Arizona v. United States*, 567 U.S. 387, 409 (2012). "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer," including conducting civil immigration arrests. *Id*. at 408 (citing 8 U.S.C. §§ 1357(g)(1), 1252c, 1324(c)).  None of these circumstances apply here.

16.   Outside of these limited circumstances, federal law prohibits the "unilateral decision of state officers to arrest an alien for being removable." *Id*. at 410.

17.   Consequently, PSP troopers are prohibited from unilaterally stopping or detaining a person simply because they believe that person may be subject to civil immigration enforcement.

18.   PSP troopers also cannot lawfully prolong traffic stops beyond the time necessary to address the underlying reason for the stop, typically a traffic violation, unless they have independent reasonable suspicion or probable cause of criminal activity, or some other legal authority to prolong the detention.

19.     PSP has a duty to train troopers about the legal scope of their powers to stop, detain, and arrest civilians.  Under both Title VI and the U.S. Constitution, that duty includes training PSP troopers to abide by federal law limits on their authority.

20.     PSP also has a duty to not be deliberately indifferent to illegal discrimination when PSP troopers are impermissibly using perceived race, color, ethnicity, or national origin as a basis to stop and/or detain an individual.

21.     Prior to 2019, PSP did not have a policy directing or guiding troopers on the limits of their authority to enforce immigration laws.

22.     Prior to 2019, PSP did not provide troopers with any training on the limits of their authority to enforce civil immigration laws.

23.     Prior to 2017, PSP troopers were alleged to have engaged in ethnic profiling of Latino motorists.  *See, e.g., Ramos, Jr. v. Trooper Justin M. Summa et al.,* 5:16-cv-02765-JLS (E.D. Pa.); *Bernstein v. Goldsmith et al*., 5:15-cv-06099-JLS (E.D. Pa.).  And in 2017, a federal court judge suppressed evidence obtained as a result of an unlawful traffic stop of a Latino man by a PSP trooper.  *U.S. v. Payano,* 2:17-cr-00238-RBS (E.D. Pa).

24.     Additionally, beginning in 2017, PSP was aware of increased reports of troopers engaging in ethnic profiling and immigration-law enforcement.  The increase corresponded with actions taken by the current administration to expand

immigration enforcement, which include an executive order issued in January 2017 and a Department of Homeland Security ("DHS") memorandum issued in February 2017.  The executive order expanded enforcement priorities so extensively that, while it did not purport to eliminate all enforcement priorities, it effectively did.[1]  This order, coupled with the DHS memorandum that rescinded prior guidelines authorizing immigration agents to exercise discretion and not detain or seek removal in particular circumstances, led to an increase in immigration enforcement.[2]

25.     Although the presidential executive order and the DHS memorandum did not apply directly to PSP troopers, the expansion of civil immigration enforcement coincided with some PSP troopers engaging in a pattern and practice of stopping people based on their perceived race, color, ethnicity, or national origin, and prolonging stops to investigate immigration status.

---

[1] Exec. Order No. 13768, No. 18, Reg. 8799 (Jan. 25, 2017), https://www.federalregister.gov/documents/2017/01/30/2017-02102/enhancing-public-safety-in-the-interior-of-the-united-states; *see also*, *The End of Immigration Enforcement Priorities Under the Trump Administration,* American Immigration Council (March 2018), https://exchange.americanimmigrationcouncil.org/research/immigration-enforcement-priorities-under-trump-administration

[2] Memorandum from John Kelly, *Enforcement of the Immigration Laws to Serve the National Interest* (February 20, 2017), https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf

26.     Acting Deputy Commissioner of Operations James Degnan acknowledged as much during his March 2019 testimony at a House Judiciary Committee hearing.  He testified that, "I think the landscape on immigration has changed sir, on on a federal level and it has driven, again, most of the states to have to take a look at how they address it."[3]

27.     Public reports documented some of PSP's ethnic profiling and immigration-law-enforcement activities, which included stops of both motorists and pedestrians based on their Latino appearance.  *See* Dale Russakoff and Deborah Sontag, *For Cops Who Want to Help ICE Crack Down on Illegal Immigration, Pennsylvania Is a Free-For-All*, ProPublica (April 12, 2018) ( "ProPublica").[4]  In their review of court records, ProPublica found that PSP troopers were issuing significantly more citations to Latino motorists, and that they were doing so in numbers that were disproportionate to Census population data.[5] In many of these stops, the trooper's investigative focus was exclusively on the motorist's immigration status, not some crime or vehicle code violation.

---

[3] *Informational meeting on Pennsylvania State Police Policy AR 7-14,* Pennsylvania House Judiciary Committee Hearing, March 20, 2019, http://pahousegop.com/Video/Judiciary
[4] *Available at* https://www.propublica.org/article/pennsylvania-immigration-ice-crackdown-cops-free-for-all
[5] *Id.*

28.     ProPublica identified Defendant Macke as a PSP trooper whose stops of Latino motorists had increased since early 2017, and documented his aggressive questioning of motorists about their immigration status during numerous stops.[6]

29.     Since 2017, PSP supervisory officials, including now Commissioner Robert Evanchick, Acting Deputy Commissioner of Operations James Degnan, and now Director of Basic Training Linette Quinn, knew that PSP troopers, including Defendant Macke, had repeatedly overstepped their legal authority for the stated purpose of enforcing federal civil immigration law and engaged in unilateral immigration stops and/or detentions.  In addition, PSP supervisory officials were also aware that troopers, including Defendant Macke, had also repeatedly engaged in stops and/or detentions on the basis of perceived race, color, ethnicity, or national origin.

30.     During a February 25, 2019, Pennsylvania House Appropriations Committee budget hearing, Evanchick testified that "[a]bout a year and a half, two years ago, it was brought to our attention that we did have some people who were stopping individuals that were kind of creating an issue for us."[7]

31.     As Commissioner Evanchick testified, PSP has long known about the problem.  In June 2017, several concerned community members met with Quinn,

---

[6] *Id*.

[7] *Pennsylvania House Appropriations Committee Budget Hearing*, February 25, 2019,  https://s3.us-east-2.amazonaws.com/pagopvideo/220398796.mp4

who at the time was one of the top command staff for Troop H (Troop H covers five counties and includes the Carlisle barracks, which is where Defendant Macke worked). They explained to her that troopers were engaging in discriminatory stops and/or detentions of Latino community members based upon perceived race, color, ethnicity, or national origin and for the stated purpose of enforcing civil immigration law.

32. Quinn acknowledged the complained about practice, but justified it by telling the gathering that it was a long-standing and widespread PSP practice across Pennsylvania.

33. After learning that PSP had no policies or procedures to curtail this troubling practice, community advocates pressed PSP supervisory officials and their liaison from the Governor's office to develop clear directives and training to end PSP's pattern and practice of discriminatory stops and detentions undertaken to enforce civil immigration law.

34. Community advocates met multiple times with either PSP liaisons from the Governor's office or PSP supervisory officials to complain about the ongoing immigration stops and to press PSP to issue clear guidance.

35. It was not until early 2019 that PSP issued a policy on trooper engagement with foreign nationals, but the policy does not provide sufficient guidance to stop troopers' unlawful immigration enforcement activities.

36.     Hence, more than two years after clear evidence emerged that PSP troopers were engaging in unlawful discrimination and illegally enforcing federal civil immigration laws, PSP still has not provided troopers with necessary guidance and appropriate training to curtail these problems.

**b.     Stop and Detention of Plaintiffs**

37.     On April 9, 2017, Ms. Marquez was driving her sports utility vehicle ("SUV") from New York to visit family in Virginia.

38.      Seated next to her was Mr. Cambar Matute, her partner of 5 years. In the backseat sat her adult son, Mr. Lovos Marquez, and her two young daughters, who at the time were ages 8 and 11.

39.     While driving on Interstate 81 near Carlisle, Pennsylvania, Ms. Marquez and Mr. Cambar Matute observed a police vehicle following them.  It was not until several minutes after they first noticed the police vehicle that the driver, Defendant Macke, turned on his lights and signaled Ms. Marquez to pull over, which she did promptly.

40.     Defendant Macke approached the driver's side door and told Ms. Marquez that he had initiated the traffic stop because Ms. Marquez was speeding.

41.     Defendant Macke requested Ms. Marquez's driver's license.  While Ms. Marquez was surprised that Defendant Macke did not ask for her registration or insurance card as well, she promptly produced her driver's license.

42.     Instead of returning immediately to his patrol vehicle to verify Ms. Marquez's driver's license and issue a citation, Defendant Macke asked Ms. Marquez whether she had a "green card."  Ms. Marquez understood the request to be for documentation demonstrating her immigration status.

43.     While Ms. Marquez once again was surprised by this request, she felt compelled to comply.  She explained to Defendant Macke that she did not have a green card, but that she did have a U.S. government-issued work permit that authorized her to be employed, which she gave to Defendant Macke.

44.     Even at this point Defendant Macke did not return to his patrol vehicle to check on Ms. Marquez's documents.  Instead – and without explanation – Defendant Macke turned his attention to the passengers.

45.     Defendant Macke instructed Mr. Lovos Marquez, who was sitting in the backseat, to roll down his window.

46.     Defendant Macke began to interrogate Mr. Cambar Matute and Mr. Lovos Marquez about their immigration status.

47.     Defendant Macke asked Mr. Cambar Matute whether he was "legal or illegal."

48.     Before Mr. Cambar Matute replied, Ms. Marquez asked Defendant Macke why he was questioning the passengers about their immigration status.

49.     Defendant Macke told her that the passengers had to show him their "papers" and that it was "his right to ask for immigration papers."

50.     Mr. Cambar Matute asked Defendant Macke if he was an "Immigration officer," to which Defendant Macke replied that he was not.

51.     Mr. Cambar Matute asked Defendant Macke why, then, he was asking whether he was "legal or illegal."

52.     Defendant Macke explained that he was "working with Immigration" and threatened to call Immigration and Customs Enforcement ("ICE").

53.     Mr. Cambar Matute and Mr. Lovos Marquez did not answer any questions or provide documents, so Defendant Macke returned to his vehicle with just Ms. Marquez's documents.

54.     About 10 to 20 minutes later, Defendant Macke returned to the SUV. At this time, he again insisted that Mr. Cambar Matute and Mr. Lovos Marquez had to answer his questions and show their "papers."

55.     Defendant Macke again threatened to call ICE if the two men did not comply with his requests.

56.     Mr. Cambar Matute and Mr. Lovos Marquez felt compelled to provide a response.

57.     While Mr. Lovos Marquez provided a response and produced his Salvadoran passport, Mr. Cambar Matute did not provide a response about his

purported immigration status.  Instead, Mr. Cambar Matute gave Defendant Macke his Honduran identification card, his library card, and a bank card.

58.     Defendant Macke told Mr. Cambar Matute that he had to produce a "green card" or other document to demonstrate his immigration status, to which Mr. Cambar Matute explained that the documents he gave Defendant Macke were all he had with him at the time.

59.     Defendant Macke returned to his patrol car for a second time, with the two men's identification documents.

60.     After approximately another 10 to 20 minutes, Defendant Macke returned to the SUV.  He instructed Ms. Marquez to step outside.  He then escorted her to the rear of the SUV, where he began interrogating her.

61.     Defendant Macke demanded to know how long Ms. Marquez had lived in the United States, where she currently worked, how long she had worked for her current employer, how old she was, where she was living, and to where she was traveling with her family.  Defendant Macke also asked her about Mr. Cambar Matute and Mr. Lovos Marquez.

62.     Even though none of Defendant Macke's questions related to her driving or any other alleged vehicle code violation, Ms. Marquez felt compelled to respond.

63.     While Defendant Macke interrogated Ms. Marquez behind the family SUV, her daughters grew frightened and could be heard crying.

64.     After Defendant Macke finished interrogating Ms. Marquez, he ordered her to return inside the SUV and await further instruction.

65.     About an hour after the initial stop, another PSP trooper, whose identity is at this time unknown to Plaintiffs, arrived at the scene.

66.     Defendant Macke and the second trooper approached Ms. Marquez's SUV and ordered Mr. Cambar Matute and Mr. Lovos Marquez out of the SUV, placed them in handcuffs, and led them to separate patrol vehicles.

67.     Only after the officers secured the two men in their vehicles did Defendant Macke return to Ms. Marquez, whereupon he returned her documents and gave her a citation for speeding.

68.     When Ms. Marquez asked Defendant Macke why he was arresting her partner and son, Defendant Macke told her it was because they "did not have papers."

69.     Ms. Marquez's daughters were crying in the backseat, traumatized by the long stop and the arrest of their older brother and of Mr. Cambar Matute, who is a father figure to them.

70.     Defendant Macke and the other trooper transported Mr. Cambar Matute and Mr. Lovos Marquez to the Carlisle barracks.

14

71.     Mr. Cambar Matute and Mr. Lovos Marquez remained handcuffed for about an hour until an ICE officer arrived.

72.     During their detention at the barracks, Mr. Lovos Marquez asked to use the bathroom several times.

73.     After denying Mr. Lovos Marquez's request several times, a trooper removed Mr. Lovos Marquez's handcuffs and permitted him to use the bathroom.

74.     When Mr. Lovos Marquez returned from the bathroom, a trooper placed the handcuffs back on him, but much more tightly.  Mr. Lovos Marquez understood this to be punishment for requesting to use the bathroom.

75.     When an ICE officer finally arrived at the barracks, the ICE officer did not question Mr. Cambar Matute and Mr. Lovos Marquez about their purported immigration status.

76.     Instead, the ICE officer fingerprinted them and then transported them to the ICE field office in York, Pennsylvania, where they were processed.

77.     By the time they were transported to York County Prison, it was several hours after the traffic stop by Defendant Macke.

78.     As a result of Defendant Macke's actions, Mr. Cambar Matute and Mr. Lovos Marquez were placed in removal proceedings and confined in ICE custody at the York County Prison.

79.     Mr. Cambar Matute was detained at York County Prison until April 17, 2017, when an Immigration Judge ordered him released on a $1,500 bond.

80.     Mr. Lovos Marquez was detained at York County Prison until May 16, 2017, when an Immigration Judge ordered him released on a $6,000 bond.

81.     As a result of the unlawful conduct described in the foregoing paragraphs, Plaintiffs suffered substantial damages including emotional trauma and distress, loss of enjoyment of life, and financial damages, some or all of which may be permanent.

### c.     Violations of Plaintiffs' Constitutional and Federally Protected Rights

82.     Defendant Macke violated Ms. Marquez's, Mr. Cambar Matute's, and Mr. Lovos Marquez's rights to be free from unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the United States Constitution by instituting a groundless or discriminatory stop on the basis of their perceived race, color, ethnicity, or national origin; and by extending the stop beyond the time reasonably necessary to resolve any alleged traffic violation.

83.     Upon information and belief, Defendant Macke had observed the family SUV and its occupants long enough to discern Plaintiffs' race, color, and Latino appearance.

84.     Upon information and belief, Defendant Macke initiated the stop because of Plaintiffs' race, color, or Latino appearance.

85.     Furthermore, Defendant Macke had no legitimate reason to believe that there was legal cause to support these prolonged detentions.

86.     Defendant Macke's actions were impermissibly based on Plaintiffs' perceived race, color, ethnicity, or national origin.

87.     Defendant Macke extended the detention of Plaintiffs longer than was necessary to effectuate any legitimate traffic stop purpose.  He did so for the purpose of unilateral civil immigration enforcement.

88.     Doubts about Plaintiffs' lawful presence in the United States, based solely on their perceived race, color, ethnicity, or national origin, provided no legal basis for Defendant Macke's actions in stopping the Plaintiffs and unilaterally extending their detentions thereafter.

89.     Defendant Macke further unlawfully detained Plaintiff Marquez when he told her to return to her SUV and wait for further instruction, indicating she was not free to leave, and by waiting over an hour from the initial stop before issuing a traffic citation to Ms. Marquez.

90.     Moreover, and upon information and belief, federal officers did not ask Defendant Macke to detain Ms. Marquez in order to facilitate her removal.

91.     Defendant Macke was acting on behalf of PSP, an agency of the Commonwealth, and a recipient of federal financial assistance, when he

discriminated against Plaintiffs by detaining them based on their race, color, or national origin.

92.    At all relevant times, PSP supervisory officials identified herein were aware of Defendant Macke's pattern of discriminatory conduct, were the appropriate persons to remedy that discriminatory conduct, and were deliberately indifferent to the pattern and practice of illegal conduct by failing to take reasonable and necessary measures to curtail the problem.

93.    At all relevant times, as described by the facts outlined above, the conduct of the Defendants was in willful, reckless, and callous disregard of Plaintiffs' rights under federal law.

## V.    CLAIMS FOR RELIEF

### COUNT I
### Plaintiffs v. Defendant Commonwealth of Pennsylvania
### Title VI – Race and National Origin Discrimination

94.    The foregoing allegations are re-alleged and incorporated herein by reference.

95.    The Commonwealth of Pennsylvania and its agency, the PSP, are public entities that receive federal financial assistance.

96.    The Commonwealth violated Title VI by acting with deliberate indifference to the risk and knowledge that PSP troopers, including Defendant

Macke, were discriminating on the basis of perceived race, color, ethnicity, or national origin.

97.    Because supervisory officials, including Acting Commissioner Evanchick, Acting Deputy Commissioner Degnan, and Quinn were the appropriate persons to address or remedy Defendant Macke's discriminatory conduct, the Commonwealth of Pennsylvania is liable to Plaintiffs for damages under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

**COUNT II**
**Plaintiffs v. Defendant Luke Macke**
**Unlawful Detention – Fourth Amendment and Fourteenth Amendment**

98.    The foregoing allegations are re-alleged and incorporated herein by reference.

99.    The Fourth Amendment to the U.S. Constitution, which applies to state actors under the Fourteenth Amendment, prohibits "unreasonable searches and seizures."  U.S. Const., amend. IV.

100.   Defendant Macke unreasonably detained and extended the detention of Plaintiffs without any lawful basis.

101.   As such, Defendant Macke is liable to Plaintiffs for damages under 42 U.S.C. § 1983.

## COUNT III
### Plaintiffs v. Defendant Luke Macke
### Unlawful Discrimination – Fourteenth Amendment

102.   The foregoing allegations are re-alleged and incorporated herein by reference.

103.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees all persons equal protections of the law.

104.   Defendant Macke violated Plaintiffs' right to equal protection of the law under the Fourteenth Amendment by stopping and/or detaining Plaintiffs based on their perceived race, color, ethnicity, or national origin.

105.   As such, Defendant Macke is liable to the Plaintiffs for damages under 42 U.S.C. § 1983.

## REQUESTED RELIEF

**WHEREFORE**, Plaintiffs Ms. Marquez, Mr. Cambar Matute, and Mr. Lovos Marquez respectfully request:

A.   Actual and compensatory damages sufficient to make Plaintiffs whole;

B.   Punitive damages against Defendant Macke to punish him and deter further wrongdoing;

C.   Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law; and

D.      Such other and further relief as may appear just and

appropriate.

*/s/ Kathryn E. Deal*
Kathryn E. Deal*
    PA ID. No. 93891
Mira Baylson*
    PA ID. No. 209559
Ellen L. Pierce*
    PA ID. No. 318579
Jonathan Aronchick*
    PA. ID. No. 321244
AKIN GUMP STRAUSS HAUER &
    FELD LLP
Two Commerce Square
2001 Market Street, Suite 4100
Philadelphia, PA 19103
Telephone: 215.965.1200
kdeal@akingump.com
mbaylson@akingump.com
epierce@akingump.com
jaronchick@akingump.com


*/s/ Seth F. Kreimer*
Seth F. Kreimer
    PA. ID. No. 26102
3501 Sansom Street
Philadelphia, PA 19104
(215) 898-7447
skreimer@law.upenn.edu

*/s/ Witold J. Walczak*
Witold J. Walczak
    PA ID. No. 62976
Vanessa L. Stine
    PA ID. No. 319569
Golnaz Fakhimi*
    NY ID. No. 5063003
AMERICAN CIVIL LIBERTIES
    UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
(215) 592-1513
vwalczak@aclupa.org
vstine@aclupa.org
gfakhimi@aclupa.org


*/s/ Jonathan H. Feinberg*
Jonathan H. Feinberg
    PA ID. No.  88227
KAIRYS, RUDOVSKY, MESSING,
    FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
215-925-4400
jfeinberg@krlawphila.com


*Petition pending for special admission to the bar of the Court*