## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____
                          :

| | |
|---|---|
| **MARIA MARQUEZ,** | |
| **EDUIN ARTURO CAMBAR** | |
| **MATUTE, MILTON FRANCISCO** : | |
| **LOVOS MARQUEZ,** | |
| **ANDRES GONZALEZ OLVERA,** : | |
| **JORGE ALBERTO GARCIA,** : | **No. 1:19-cv-00599-YK** |
| **REBECCA CASTRO, CARLOS** : | |
| **AMAYA CASTELLANOS,** : | **(Judge Kane)** |
| **ROBERTO CASTANEDA** : | |
| **MORALES, BERNABE LOPEZ** : | |
| **CASTRO, and FAUSTINO** : | |
| **MARTINEZ LOBATO,** : | |
| : | |
|       **Plaintiffs,** : | |
| : | |
|    **v.** : | |
| : | |
| **COMMONWEALTH OF** : | |
| **PENNSYLVANIA,** : | |
| **PENNSYLVANIA STATE POLICE** : | |
| **TROOPERS LUKE MACKE,** : | |
| **JOSEPH MANNING, MICHAEL** : | |
| **PATRONE, JOHN DOE,** : | |
| **CLAY FORCEY, CHRISTOPHER** : | |
| **PASQUALE, and** : | |
| **CHAD RONK,** : | |
| : | |
|       **Defendants.** : | |

_____:

## AMENDED COMPLAINT

# I.   PRELIMINARY STATEMENT

1.     Pennsylvania State Police (PSP) troopers consistently have violated clearly established law by profiling and illegally stopping people based on their Latino appearance in order to uncover supposed immigration violations. Since at least early 2017, troopers from across the Commonwealth have engaged in a pattern and practice of unlawful civil immigration enforcement that has ripped apart families, terrorized motorists, and sent a clear message to communities across Pennsylvania: the state police are in the immigration business.

2.     The ten Plaintiffs in this action challenge a pattern of police misconduct that follows a common script: troopers follow and pull over Latino motorists and then, based on improper and illegal presumptions, immediately focus on ascertaining the immigration status of the car's occupants – including the passengers – instead of any purported traffic infraction. This results in prolonged detentions that sometimes last several hours.

3.     The PSP troopers' initial stops and detentions in the five incidents raised in this action were neither instigated nor requested by U.S. Immigration and Customs Enforcement (ICE), the federal immigration enforcement agency.

4.     Instead, PSP troopers have taken it upon themselves to act as enforcers of the complex system of federal civil immigration laws, but without any training, oversight, or the requisite legal authority.

5.     PSP troopers have engaged in this pattern and practice of misconduct with the knowledge and tacit approval of PSP leadership. The Commonwealth of Pennsylvania ("Commonwealth") through its agency, the Pennsylvania State Police, and PSP supervisory officials, have been deliberately indifferent to this pattern of discriminatory profiling and illegally prolonged detentions to investigate immigration status. Importantly, despite their knowledge of this unlawful practice, they failed to take necessary, appropriate, and timely steps to curtail the misconduct.

6.     The Plaintiffs in this civil rights action include a family traveling to see loved ones, farmworkers finishing a long day of work, workers traveling interstate to complete jobs, and a car accident victim. The Defendant troopers' illegal conduct has caused great harm not only to the Plaintiffs themselves, but also to their families, friends, and employers.

7.     In bringing this action, Plaintiffs Maria Marquez, Eduin Arturo Cambar Matute, Milton Francisco Lovos Marquez, Andres Gonzalez Olvera, Jorge Alberto Garcia, Rebecca Castro, Carlos Amaya Castellanos, Roberto Castaneda Morales, Bernabe Lopez Castro, and Faustino Martinez Lobato seek to vindicate their constitutional rights to be free from discriminatory and/or unjustified stops and unlawful detention on the basis of their perceived race, color, ethnicity, or national origin. They also seek to vindicate their constitutional right to be free from

unlawful detentions by state actors who are not authorized to enforce civil immigration law. Plaintiffs seek compensation for their harms and losses. Plaintiffs also hope that by bringing this action, the PSP will take seriously and improve its supervisory and training responsibilities to prevent troopers from engaging in similar illegal conduct in the future.

8.     Plaintiffs bring this action against the Commonwealth under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), and against the individually named PSP troopers under 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the U.S. Constitution.

## II.     JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this Complaint under 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343(a)(3)-(4).

10.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because defendants have their principal place of business in the Middle District of Pennsylvania and all but one of the events that gave rise to this Complaint occurred within the Middle District of Pennsylvania.

## III.    PARTIES

11.    The ten Plaintiffs are all Latino.

12.     At all times relevant to this Complaint, the Defendant troopers were employed by PSP and acting under color of state law. Plaintiffs sue these Defendants in their individual capacity.

13.     Defendant Commonwealth of Pennsylvania is a public entity that receives federal funds and, accordingly, is subject to Title VI.

14.     Defendant Commonwealth of Pennsylvania operates the Pennsylvania State Police, a law enforcement agency established and operating under the laws of Pennsylvania.

## IV.     FACTUAL ALLEGATIONS

### a.  PSP Troopers' Pattern and Practice of Violating Clearly Established Federal Law

15.     Since at least early 2017, PSP troopers have engaged in a pattern and practice of unlawfully enforcing federal civil immigration law. That PSP practice regularly includes unilateral actions to enforce federal civil immigration law and discriminatory stops and prolonged detentions without sufficient legal cause. These actions violate clearly established federal law.

16.     The United States Supreme Court has explained that, "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States," and, thus, stopping "someone based on nothing more possible removability"—i.e., that they may not have lawful immigration status—does not provide the "usual predicate for an arrest . . . ." *Arizona v. United States*, 567 U.S. 387, 407 (2012).

17.     The immigration "removal process is entrusted to the discretion of the Federal Government." *Id*. at 409. "Federal law specifies limited circumstances in which state officers may perform the functions of an immigration officer," including conducting civil immigration arrests. *Id*. at 408 (citing 8 U.S.C. §§ 1357(g)(1), 1252c, 1324(c)). Outside of these limited circumstances, federal law prohibits the "unilateral decision of state officers to arrest an alien for being removable." *Id*. at 410.

18.     None of the circumstances that could legally authorize PSP troopers to stop and detain people to investigate immigration status applies to the mistreatment of Plaintiffs as outlined in this action.

19.     Nonetheless, with zeal – and overreach – to enforce federal civil immigration law, PSP troopers regularly "profile" people based on their apparent race, color, ethnicity, or national origin and use a pretext to conduct a traffic stop or other investigative detention in order to investigate those individuals' immigration status. These seizures violate the Constitution and federal anti-discrimination law.

20.     In addition to being unlawful, such civil immigration enforcement is simply bad public policy. The Major Cities Chiefs Association (MCCA), a group of police chiefs from the 69 largest police departments in the United States and Canada, has repeatedly issued statements or provided testimony highlighting how

the involvement of state and local law enforcement in civil immigration enforcement undermines public safety and community trust.

21.     Notwithstanding the important policy considerations, the law is clear: it is illegal for police officers, including PSP troopers, to unilaterally stop or detain a person simply because they suspect that a person may be subject to civil immigration enforcement.

**b.  The History of PSP's Discriminatory Pattern and Practice**

22.     PSP troopers' practice of engaging in illegal civil immigration enforcement activities accelerated in early 2017, but the issue of profiling Latinos based on perceived race, color, ethnicity, or national origin did not start then. Two cases involving incidents from 2013 and 2014 alleged that troopers profiled motorists based on apparent Latino heritage. *See, e.g., Bernstein v. Goldsmith et al.*, 5:15-cv-06099-JLS (E.D. Pa.); *Ramos, Jr. v. Trooper Justin M. Summa et al.*, 5:16-cv-02765-JLS (E.D. Pa.). And in 2017, a federal court judge suppressed evidence obtained from a PSP trooper's unlawful traffic stop of a Latino man in April 2017. *U.S. v. Payano*, 2:17-cr-00238-RBS (E.D. Pa.).

23.     In early 2017, PSP troopers began stopping Latino motorists at a higher rate and detaining more people for immigration purposes.

24.     The increase in PSP's civil immigration enforcement activity corresponded with actions taken by the then-newly-installed presidential

administration to expand immigration enforcement. An Executive Order, coupled with a U.S. Department of Homeland Security ("DHS") memorandum implementing the Order, rescinded prior guidelines authorizing ICE officers to exercise discretion not to detain or seek removal in particular circumstances. In other words, the Order enabled ICE to arrest people without regard to their family, health, or humanitarian circumstances. Consistent with the Order and implementing memorandum, federal civil immigration enforcement activity increased significantly, resulting in the apprehension and detention of more people.

25.     Although the Order and the DHS memorandum did not apply to PSP troopers, the expansion of civil immigration enforcement activities coincided with PSP troopers engaging in a pattern and practice of stopping people based on their perceived race, color, ethnicity, or national origin – especially people of Latino appearance – and prolonging stops to investigate immigration status.

26.     In April 2018, an independent, nonprofit news organization, ProPublica, published a series of articles on increased immigration enforcement in Pennsylvania since early 2017. One of the articles highlighted how PSP troopers were engaging in civil immigration enforcement by targeting Latinos using traffic

stops where their primary investigative focus was on the motorists' and passengers' immigration status, not a vehicle code violation.[1]

27.    Indeed, Pennsylvania state court records indicate that, in 2017, some PSP troopers issued significantly more citations to Latino motorists than in prior years, and that they were doing so in numbers that were disproportionate to the area's Latino population, based upon Census data.

28.    One PSP trooper who markedly increased his stops of Latino motorists in 2017 was Defendant Luke Macke,[2] who was involved in two of the incidents challenged in this case.

29.    In 2015, Macke issued 33 citations to Latino drivers. In 2017, he issued 113 citations to Latino drivers. The rate at which Macke cited Latino drivers also increased during that time, growing from 6.3% of all citations in 2015 to 14.5% of all citations in 2017.

30.    Plaintiffs' experiences, recounted below, are typical of many other PSP civil immigration enforcement activities from the past two years.

---

[1] *See* Dale Russakoff and Deborah Sontag, *For Cops Who Want to Help ICE Crack Down on Illegal Immigration, Pennsylvania Is a Free-For-All*, ProPublica (April 12, 2018) (hereafter "*Cops Who Want to Help ICE*").
[2] *Id*.

### c. Plaintiffs' Individual Allegations

**1. Plaintiffs Maria Marquez, Eduin Arturo Cambar Matute, and Milton Francisco Lovos Marquez v. Defendant Luke Macke**

31.     Plaintiff Maria Marquez is a Latina woman who, at all times relevant hereto, resided in Brentwood, New York.

32.     Plaintiff Eduin Arturo Cambar Matute is a Latino man who, at all times relevant hereto, resided in Brentwood, New York. He is Ms. Marquez's partner.

33.     Plaintiff Milton Francisco Lovos Marquez is a Latino man. He is Ms. Marquez's adult son. At all times relevant hereto, he resided in Brentwood, New York.

34.     Defendant Luke Macke was, at all times relevant hereto, employed by PSP as a state trooper.

35.     On April 9, 2017, Ms. Marquez was driving her sports utility vehicle ("SUV") from New York to visit family in Virginia.

36.     Seated next to her was Mr. Cambar Matute, her partner of five years. In the backseat sat her adult son, Mr. Lovos Marquez, and her two young daughters, who at the time were ages 8 and 11.

37.     While driving on Interstate 81 near Carlisle, Pennsylvania, Ms. Marquez and Mr. Cambar Matute observed a police vehicle following them. After

following them for several minutes, the trooper turned on his lights and signaled Ms. Marquez to pull over, which she did promptly.

38.     The trooper, Defendant Macke, approached the driver's side door and told Ms. Marquez that he stopped her because she was speeding.

39.     Defendant Macke requested Ms. Marquez's driver's license. While Ms. Marquez was surprised that Defendant Macke did not ask for her registration or insurance card as well, she promptly produced her driver's license.

40.     Instead of returning immediately to his police vehicle to verify Ms. Marquez's driver's license and issue a citation, Defendant Macke began questioning all of the vehicle occupants about their immigration status.

41.     The only basis for Defendant Macke's questioning was the occupants' perceived race, color, ethnicity, or national origin.

42.     Defendant Macke extended the detention of Ms. Marquez, Mr. Cambar Matute, and Mr. Lovos Marquez longer than was necessary to effectuate any legitimate traffic stop purpose. He did so for the purpose of unilateral civil immigration enforcement.

43.     Defendant Macke asked Ms. Marquez whether she had a "green card." Ms. Marquez understood the request to be for documentation demonstrating her immigration status.

44.     Ms. Marquez explained to Defendant Macke that she did not have a green card, but that she did have a U.S. government-issued work permit that authorized her to be employed, which she gave to Macke.

45.     Even at this point, Defendant Macke did not return to his police vehicle to check on Ms. Marquez's documents. Instead – and without explanation – Macke began interrogating the vehicle's passengers about their immigration status.

46.     Defendant Macke demanded to know whether Mr. Cambar Matute and Mr. Lovos Marquez were "legal or illegal," referring to their immigration status.

47.     Ms. Marquez interjected to ask Defendant Macke why he was questioning the passengers about their immigration status. He told her that the passengers had to show him their "papers" and that it was "his right to ask for immigration papers."

48.     Defendant Macke told the vehicle occupants that even though he was not an "Immigration officer," he was "working with Immigration" and threatened to call ICE on them.

49.     Neither Mr. Cambar Matute nor Mr. Lovos Marquez answered Defendant Macke's questions or provided any identity documents. When Macke returned to his vehicle, he had only Ms. Marquez's documents and had no information about the identity of the two passengers.

50.     Defendant Macke's actions were impermissibly based on Ms. Marquez's, Mr. Cambar Matute's, and Mr. Lovos Marquez's perceived race, color, ethnicity, or national origin.

51.     Despite having no legitimate basis to extend the traffic stop, when Defendant Macke subsequently returned to the SUV, he once again insisted that Mr. Cambar Matute and Mr. Lovos Marquez answer his questions about their immigration status and show their "papers." This time, he threatened to call ICE if the two men did not comply with his requests.

52.     Defendant Macke's continued interrogation – on his own initiative and without involvement from federal authorities – constituted unilateral civil immigration enforcement.

53.     Defendant Macke's threats intimidated Mr. Cambar Matute and Mr. Lovos Marquez and caused them to believe that they had no choice but to comply. Mr. Lovos Marquez and Mr. Cambar Matute provided their respective identification.

54.     Defendant Macke directed Mr. Cambar Matute to produce a "green card" or other document to demonstrate his immigration status, but Mr. Cambar Matute explained that the documents he gave Macke were all he had with him at the time.

55.     Defendant Macke returned to his police car for a second time, with the two men's identification documents.

56.     Approximately 20 minutes later, Defendant Macke returned to the SUV. He directed Ms. Marquez to step outside, escorted her to the rear of the SUV, and began once again to interrogate her.

57.     Defendant Macke demanded to know how long Ms. Marquez had lived in the United States, where she currently worked, how long she had worked for her current employer, how old she was, where she was living, and to where she was traveling with her family. Defendant Macke also asked her questions about Mr. Cambar Matute and Mr. Lovos Marquez.

58.     None of Defendant Macke's questions related to Ms. Marquez's driving or any other alleged vehicle code violation.

59.     During Defendant Macke's interrogation of Ms. Marquez, her two young daughters grew frightened and began to cry.

60.     ICE did not request that Defendant Macke interrogate Ms. Marquez or detain her in order to facilitate her removal. Defendant Macke's continued seizure of Ms. Marquez prolonged her detention further and constituted unilateral civil immigration enforcement.

61.     After Defendant Macke finished interrogating Ms. Marquez, he ordered her to get back into the SUV and directed her to await further instruction.

62.     About an hour after the initial stop, another PSP trooper, whose identity is at this time unknown to Ms. Marquez, Mr. Cambar Matute, and Mr. Lovos Marquez, arrived at the scene.

63.     Defendant Macke and the second trooper approached Ms. Marquez's SUV and ordered Mr. Cambar Matute and Mr. Lovos Marquez out of the SUV, placed them in handcuffs, and led them to separate police vehicles.

64.     Only after the troopers secured the two men in their vehicles did Defendant Macke return Ms. Marquez's documents and hand her a citation for speeding.

65.     When Ms. Marquez asked Defendant Macke why he was arresting her partner and son, Defendant Macke told her it was because they "did not have papers."

66.     Ms. Marquez's daughters were crying in the backseat, traumatized by the long stop and the arrest of their older brother and of Mr. Cambar Matute, who is a father figure to them. Defendant Macke and the other trooper transported Mr. Cambar Matute and Mr. Lovos Marquez to the Carlisle barracks, where they kept the two men in handcuffs for about another hour.

67.     Defendant Macke detained Mr. Cambar Matute and Mr. Lovos Marquez for more than two hours after the initial traffic stop, until ICE officers arrived.

68.     The time it took ICE to establish probable cause far exceeded the time necessary to resolve the purported basis for the traffic stop.

69.     The ICE officers transported the men to York County Prison, where they were placed into removal proceedings. Mr. Cambar Matute and Mr. Lovos Marquez were released on bonds set by an immigration judge.

70.     As a result of the unlawful conduct described in the foregoing paragraphs, Ms. Marquez, Mr. Cambar Matute, and Mr. Lovos Marquez suffered substantial damages including emotional trauma and distress, loss of enjoyment of life, and financial damages, some or all of which may be permanent.

**2. Plaintiffs Andres Gonzalez Olvera and Jorge Alberto Garcia v. Defendants Michael Patrone and John Doe**

71.     Plaintiff Andres Gonzalez Olvera is a Latino man who, at all times relevant hereto, resided in Norristown, Pennsylvania, which is located in Montgomery County.

72.     Plaintiff Jorge Alberto Garcia is a Latino man who, at all times relevant hereto, resided in Norristown, Pennsylvania, which is located in Montgomery County.

73.     Defendant Michael Patrone was, at all times relevant hereto, employed by PSP as a state trooper.

74.     Defendant John Doe was, at all times relevant hereto, employed by PSP as a state trooper.

75.     On October 16, 2017, Mr. Gonzalez Olvera was driving home from a job interview in Hellertown, Pennsylvania.

76.     His wife, who at the time was nine months pregnant, sat next to him in the front passenger seat.

77.     Mr. Gonzalez Olvera was driving through Springfield Township in Bucks County when he noticed a police vehicle following them.

78.     After following them for several minutes, the driver of the police vehicle, Defendant Patrone, turned on his overhead lights, signaling Mr. Gonzalez Olvera to pull over, which he promptly did.

79.     Upon information and belief, Defendant Patrone initiated the stop after he observed Mr. Gonzalez Olvera and his wife and ran Mr. Gonzalez Olvera's license plate, whereupon he saw Mr. Gonzalez Olvera's Latino surname.

80.     Defendant Patrone's stop of Mr. Gonzalez Olvera and his wife was impermissibly based on their perceived race, color, ethnicity, or national origin.

81.     Defendant Patrone approached the driver's side door and his first question to Mr. Gonzalez Olvera was whether he is a U.S. citizen.

82.     Defendant Patrone's next question was whether Mr. Gonzalez Olvera had a passport, visa, or work permit.

83.     Defendant Patrone's questions of Mr. Gonzalez Olvera concerning citizenship and immigration documents had no conceivable relationship to any traffic offense or lawful basis for the stop.

84.     Defendant Patrone's actions were not at the direction of any federal immigration authority and constituted unilateral civil immigration enforcement.

85.     Only after asking these questions did Defendant Patrone ask Mr. Gonzalez Olvera for his vehicle registration, insurance, and driver's license.

86.     Mr. Gonzalez Olvera provided Defendant Patrone with his consular identification card as well as his car insurance and registration documents.

87.     Instead of returning to his police vehicle, Defendant Patrone turned his attention to Mr. Gonzalez Olvera's wife and asked for her identification. It was only after she provided him with a state issued identification that Defendant Patrone returned to his police vehicle.

88.     About fifteen minutes later, Defendant Patrone returned to the driver's side door and told Mr. Gonzalez Olvera that he "was lucky" and that "ICE had no interest in him."

89.     Defendant Patrone then returned Mr. Gonzalez Olvera's and his wife's documents and issued two citations. One of the citations was for a window obstruction related to an air freshener hanging from the rear-view mirror, which

Defendant Patrone claimed violated the Motor Vehicle Code. The other citation was for driving without a license.

90.     Mr. Gonzalez Olvera and his wife subsequently returned home.

91.     Mr. Gonzalez Olvera appealed both citations. He believed the stop was racially motivated. Additionally, the fines associated with the citations were over $1,000, a prohibitively expensive sum for his family.

92.     On February 28, 2018, Mr. Gonzalez Olvera's friend, Plaintiff Jorge Alberto Garcia, drove him to the court hearing at Magisterial District Court 07-3-03 in Ottsville, Pennsylvania.

93.     Upon arriving at the courthouse, Mr. Gonzalez Olvera and Mr. Garcia passed two parked police vehicles.

94.     A minute after Mr. Garcia pulled into a parking spot, the driver of one of the police vehicles illuminated the overhead lights and pulled up behind him, blocking his exit.

95.     Defendant Patrone, the same trooper who issued Mr. Gonzalez Olvera's citations in October 2017, came to the driver's window. Defendant Doe stood behind their vehicle.

96.     Just like during Mr. Gonzalez Olvera's traffic stop in October 2017, Defendant Patrone's first question to Mr. Garcia was whether he was a U.S. citizen.

97.     The only basis for Defendant Patrone's questioning was the occupants' perceived race, color ethnicity, or national origin.

98.     Whatever doubts or suspicions Defendant Patrone may have had about Mr. Gonzalez Olvera's and Mr. Garcia's lawful presence in the United States did not provide a legal basis for him to conduct this traffic stop – after the car was parked in a lot – and to engage in unilateral civil immigration enforcement.

99.     Mr. Garcia did not respond to the question because he only understands and speaks a little English and was unable to fully understand the question.

100.    Defendant Patrone also asked Mr. Garcia whether he had a passport or visa.

101.    Mr. Gonzalez Olvera interpreted for Mr. Garcia, explaining that he needed to give Officer Patrone identification, registration, and an insurance card.

102.    Mr. Garcia gave Defendant Patrone his insurance, registration, and an international driver's license.

103.    Defendant Patrone then asked Mr. Gonzalez Olvera for identification, which he promptly provided.

104.    Defendant Patrone returned to his police vehicle with both men's identification documents.

105.    Defendants Patrone's and Doe's actions were not at the direction of any federal immigration authority and for the purpose of unilateral civil immigration enforcement. Defendants also lacked probable cause or reasonable suspicion to believe the Plaintiffs were subject to removal.

106.    After several minutes passed and Defendant Patrone had not returned from his police vehicle, Mr. Gonzalez Olvera began to worry that he would miss his hearing, as it was nearly time for it to begin.

107.    Mr. Gonzalez Olvera, believing that he needed to go into the courthouse, opened the passenger door to exit. As he was stepping out of the SUV, Defendant Doe yelled at him to get back inside the SUV and shouted, "I know where you are going and you are not going be late."

108.    Mr. Gonzalez Olvera complied with Defendant Doe's instructions and remained in the SUV.

109.    Several minutes later, Defendant Patrone returned to the driver's side door. He gave back Mr. Garcia's documents, along with several citations. He also returned Mr. Gonzalez Olvera's identification.

110.    At this point, the two troopers removed Mr. Gonzalez Olvera and Mr. Garcia from the car and frisked them. During the searches, Defendant Doe called Mr. Garcia and Mr. Gonzalez Olvera "fence jumpers." The troopers then confiscated Mr. Garcia's car keys.

111.   Approximately thirty minutes after the parking lot stop began, Defendants Patrone and Doe directed and escorted Mr. Gonzalez Olvera and Mr. Garcia into the Magisterial District Court.

112.   Mr. Gonzalez Olvera spoke to his attorney, whom he had hired to challenge the traffic citations from October, inside the courthouse. The attorney instructed Mr. Gonzalez Olvera to wait outside for him while he entered the courtroom. Several minutes later, the attorney emerged from the courtroom and spoke briefly with Mr. Gonzalez Olvera. Mr. Gonzalez Olvera was successful in reducing his fines.

113.   At this point, Defendants Patrone and Doe handcuffed Mr. Gonzalez Olvera and Mr. Garcia, escorted them to the police vehicles, placing one man in each car, and drove them to the PSP's Dublin barracks, where they shackled the men's feet.

114.   Defendants Patrone and Doe detained Mr. Gonzalez Olvera and Garcia for more than an hour and half after the initial traffic stop, until an ICE officer arrived at the Dublin barracks. By the time the ICE officer arrived, Mr. Gonzalez Olvera and Mr. Garcia had been detained at the barracks for at least thirty minutes.

115.   Despite detaining Mr. Gonzalez Olvera and Mr. Garcia since approximately 11:30 that morning, Defendants Patrone and Doe did not contact

ICE until 12:30. As such, Defendants Patrone and Doe seized and arrested the Plaintiffs for the purpose of unilateral civil immigration enforcement.

116. The ICE officer took Mr. Gonzalez Olvera and Mr. Garcia to Lehigh County Prison and later transferred them to York County Prison. They were placed into removal proceedings. Mr. Gonzalez Olvera and Mr. Garcia were released on bonds set by an immigration judge.

117. As a result of the unlawful conduct described in the foregoing paragraphs, Mr. Gonzalez Olvera and Mr. Garcia suffered substantial damages including emotional trauma and distress, loss of enjoyment of life, and financial damages, some or all of which may be permanent.

### 3. Plaintiffs Rebecca Castro and Carlos Amaya Castellanos v. Defendant Luke Macke

118. Plaintiff Rebecca Castro is a Latina woman who at all times relevant hereto resided in Ashley, Pennsylvania, which is located in Luzerne County.

119. Plaintiff Carlos Castellanos Amaya is a Latino man who at all times relevant hereto resided in Ashley, Pennsylvania, which is located in Luzerne County. He and Ms. Castro are now married.

120. Defendant Luke Macke was, at all times relevant hereto, employed by PSP as a state trooper.

121. On May 10, 2018, Ms. Castro was driving her pickup truck from Luzerne County to Maryland to install a carport.

122.   Ms. Castro's then-boyfriend, Mr. Amaya Castellanos, sat next to her. A co-worker sat in the backseat.

123.   Ms. Castro's truck was pulling a "gooseneck trailer," which is a trailer with no walls or enclosures.

124.   While driving south on Route 15 and stopped at a red light near Dillsburg, Ms. Castro and Mr. Amaya Castellanos observed a PSP trooper in a police vehicle in the center median watching them.

125.   When the light turned green, Ms. Castro and Mr. Amaya Castellanos saw the police vehicle immediately turn around, pull directly behind them, and turn on the overhead lights, signaling them to pull over, which Ms. Castro did.

126.   Despite signaling with his overhead lights, the officer, Defendant Macke, did not pull over behind Ms. Castro, but rather drove slowly past them, continuing south on Route 15.

127.   Upon information and belief, Defendant Macke had observed the truck and its occupants long enough to discern the Plaintiffs' Latino appearance.

128.   After a few minutes had passed and because Defendant Macke had not stopped, Ms. Castro resumed driving south on Route 15.

129.   A few minutes later, Ms. Castro and Mr. Amaya Castellanos again saw Defendant Macke ahead of them in the left lane. Defendant Macke reduced his

speed until their vehicles were side by side. Macke then shouted at Ms. Castro to pull over on a nearby side road, which she did.

130.    This time Defendant Macke pulled up behind Ms. Castro, but remained in his vehicle for several minutes.

131.    Defendant Macke approached the driver's side door and asked Ms. Castro for her license, registration, and insurance, which she promptly provided.

132.    Defendant Macke told Ms. Castro that he had stopped her because the vehicle looked suspicious and the tint of her windows was "too dark."

133.    Ms. Castro told Defendant Macke that she was not sure how a vehicle could look suspicious and that her window tint was within the legal limit.

134.    After Ms. Castro questioned Defendant Macke's reasoning, Macke stated that the police had received reports of human trafficking in the area.

135.    Ms. Castro told Defendant Macke she was not sure what about her truck or trailer – which was open, with all of its contents visible – could cause suspicion that she might be engaging in human trafficking.

136.    Defendant Macke did not respond to Ms. Castro. Instead, and without explanation, he turned his attention to the passengers and began questioning them about their immigration status. He asked Mr. Amaya Castellanos and his co-worker if they were in the United States legally.

137. Before Mr. Amaya Castellanos and his co-worker responded, Ms. Castro asked Defendant Macke why he was questioning her passengers about their immigration status.

138. Defendant Macke told Ms. Castro that because the truck was a commercial vehicle, he had the authority and "the right" to ask.

139. Ms. Castro told Defendant Macke that the immigration status of the passengers was "none of his business."

140. Defendant Macke told Ms. Castro he had a "right" to call "immigration" and persisted in questioning Mr. Amaya Castellanos and his co-worker.

141. Defendant Macke demanded the men's identification.

142. After obtaining their identification, Defendant Macke told them "ICE would show up and take care of it." Defendant Macke was making clear that he intended to detain them until ICE officers investigated the men's immigration statuses. Defendant Macke then returned to his police vehicle.

143. Defendant Macke's actions were impermissibly based on Ms. Castro's and Mr. Amaya Castellanos' perceived race, color, ethnicity, or national origin.

144. Several minutes later, Defendant Macke returned to the truck. This time, his immigration investigation lasted for at least an hour and involved a forced

phone interrogation with ICE, i.e., Macke compelled each of the three vehicle occupants to speak with an ICE officer using Macke's cellular phone.

145.    Ms. Castro objected to the phone interrogation, but Defendant Macke nonetheless forced Mr. Amaya Castellanos to submit to the questioning.

146.    Defendant Macke similarly forced Ms. Castro, who is a U.S. citizen, to submit to an interrogation by the ICE officer. Despite telling the ICE officer that she was a U.S. citizen, the ICE officer continued interrogating her. After the ICE officer asked Ms. Castro whether she was born in the United States or a naturalized citizen, she told him it was "none of his business" and refused to answer additional questions.

147.    During this exchange, Defendant Macke became visibly agitated. His face turned red and, with his voice raised, he told Ms. Castro that she had to respond to the ICE officer's questions.

148.    After the ICE officer finished questioning the three vehicle occupants, Defendant Macke took back his cell phone and returned to his car, where he was seen continuing to talk to the ICE officer.

149.    Without a lawful basis, Defendant Macke detained Ms. Castro, Mr. Amaya Castellanos, and the third vehicle occupant for approximately an hour and half – beginning with the initial stop to the end of the ICE phone interrogation.

During this approximately 90-minute period, Defendant Macke's sole focus was on civil immigration enforcement.

150.    After Defendant Macke finished speaking with the ICE officer, he returned from his police vehicle to tell Ms. Castro that she was still not free to leave.

151.    He informed her that he had to conduct a vehicle inspection. He asked to see the vehicle's safety equipment, which was located in the truck bed, which Ms. Castro and Mr. Amaya Castellanos showed him. The entire vehicle inspection lasted no more than five or ten minutes.

152.    During the vehicle inspection, two ICE officers arrived on the scene.

153.    The ICE officers arrested Mr. Amaya Castellanos and his co-worker, placing both of them in handcuffs.

154.    The ICE officers escorted Mr. Amaya Castellanos and his co-worker to their vehicle and then left. Mr. Amaya Castellanos and his colleague were placed in removal proceedings and confined in ICE custody at the York County Prison. Mr. Amaya Castellanos was released on a bond set by an immigration judge.

155.    In the meantime, more than two hours after the initial stop, Defendant Macke handed Ms. Castro several citations related to operation of a commercial vehicle, all unrelated to the reasons Macke initially gave for the traffic stop.

156. Defendant Macke also told Ms. Castro, as a tow truck arrived on the scene, that he was having her truck and trailer towed away.

157. Without the trailer, the truck was not a "commercial vehicle," which meant there was no legal or other constraint on Ms. Castro operating it. But Defendant Macke directed the tow truck to take away both the truck and trailer, leaving Ms. Castro without transportation.

158. As a result of the unlawful conduct described in the foregoing paragraphs, Ms. Castro and Mr. Amaya Castellanos suffered substantial damages including emotional trauma and distress and loss of enjoyment of life, some or all of which may be permanent. Ms. Castro also suffered financial loss as a result of Defendant Macke's unlawful conduct.

### 4. Plaintiffs Roberto Castaneda Morales and Bernabe Lopez Castro v. Defendants Chad Ronk and Joseph Manning

159. Plaintiff Roberto Castaneda Morales is a Latino man who at all times relevant hereto resided in Upper Sandusky, Ohio.

160. Plaintiff Bernabe Lopez Castro is a Latino man who at all times relevant hereto resided in Upper Sandusky, Ohio.

161. Defendant Chad Ronk was, at all times relevant hereto, employed by PSP as a Commercial Vehicle Officer.

162. Defendant Joseph Manning was, at all times relevant hereto, employed by PSP as a state trooper.

163.    On the afternoon of August 28, 2018, Mr. Castaneda Morales and Mr. Lopez Castro, who live in Ohio, finished the first day of a weeklong job at a poultry transport company in Pennsylvania.

164.    A co-worker was driving them and ten other workers in a large van back to their local housing. Mr. Castaneda Morales was in the front passenger seat. Mr. Lopez Castro was in the back of the van with his co-workers.

165.    As they approached a stop sign on Route 114 near Mechanicsburg, Defendant Ronk crossed the road on foot and waved at the van to pull over, which the driver did.

166.    Defendant Ronk's traffic stop had no lawful basis, but was instead based on information obtained during a previous stop of the company's work van days earlier and based on the perceived race, color, ethnicity, or national origin of the van's Latino occupants.

167.    Defendant Ronk approached the driver's side door and asked the driver for his license, registration, and insurance, which he promptly provided. He also asked the driver several questions about safety equipment, including about a fire extinguisher and lights.

168.    The driver, who understands and speaks little English, could not understand Defendant Ronk's questions about safety equipment. Defendant Ronk

stated that if the driver could not understand him, Ronk would have to call a tow truck.

169.   Mr. Castaneda Morales, who is proficient in English and fluent in Spanish, offered to interpret. He explained Defendant Ronk's questions to the driver and interpreted the driver's responses for Ronk.

170.   After asking several questions, Defendant Ronk returned to his police vehicle across the street.

171.   Several minutes later, Defendant Ronk returned to the van and resumed asking the driver additional safety and equipment related questions.

172.   Approximately 20 to 30 minutes after Defendant Ronk initiated the stop, Defendant Manning arrived on the scene.

173.   Defendant Manning walked up to the passenger side of the van and without asking permission, giving a warning, or offering an explanation, opened the passenger side rear door. He asked the passengers, "are you illegals or legals?" He also demanded that all of the passengers provide identification.

174.   At this point in the stop, Defendants Ronk and Manning did not know the identity of the van's passengers and had not yet contacted ICE. As such, Defendants were detaining Mr. Castaneda Morales and Mr. Lopez Castro on their own initiative solely based on their Latino appearance and suspicion that the men might be subject to removal.

175. Defendants' Manning and Ronk's actions were impermissibly based on the van occupants' perceived race, color, ethnicity, or national origin.

176. Doubts about Mr. Castaneda Morales' and Mr. Lopez Castro's lawful presence in the United States provided no legal basis for Defendants Manning and Ronk to extend the traffic stop and engage in unilateral civil immigration enforcement.

177. Without answering Defendant Manning's question about their immigration status, Mr. Castaneda Morales and Mr. Lopez Castro provided their respective identification. After Defendant Manning finished collecting identification from those who had it, he returned to his police vehicle.

178. A few minutes after Defendant Manning returned to his police vehicle, Defendant Ronk concluded his questioning of the driver and returned to his police vehicle. At this point there was no lawful basis to extend the traffic stop and continue to detain the van's occupants.

179. Believing, based on Ronk's and Manning's actions, that they were not free to leave, Mr. Castaneda Morales, Mr. Lopez Castro, and their co-workers remained in the van for more than an hour.

180. When Defendants Ronk and Manning contacted ICE, an ICE officer told them they would respond to the scene to "determine alienage." This means

that, when called, ICE did not communicate to Defendants Ronk and Manning that there was probable cause that anyone was subject to removal.

181.   Despite the lack of probable cause, Defendants Ronk and Manning continued to detain Mr. Castaneda Morales and Mr. Lopez Castro.

182.   Over an hour after the initial stop, three ICE officers arrived. One of the ICE officers instructed the workers to exit the van when they heard their name. Each worker who exited the van was quickly handcuffed.

183.   When an ICE officer handcuffed Mr. Lopez Castro, it became apparent that the ICE officer was unsure of Mr. Lopez Castro's immigration status because he repeatedly pressed him to say whether he was legal or illegal. The ICE officer said he "only needs to know whether he crossed illegally."

184.   When an ICE officer interrogated Mr. Castaneda Morales, he refused to respond to questions about his immigration status and asked to have his attorney present for further questioning. The ICE officer handcuffed Mr. Castaneda Morales.

185.   The ICE officers took everyone but the driver into custody.

186.   After ICE left, Defendant Ronk gave the driver a citation for "unlawful activities" and permitted him to leave. A Magisterial District Judge later dismissed the citation.

187. Mr. Castaneda Morales and Mr. Lopez Castro were detained and then released on bonds set by an immigration judge.

188. As a result of the unlawful conduct described in the foregoing paragraphs, Mr. Castaneda Morales and Mr. Lopez Castro suffered substantial damages including emotional trauma and distress, loss of enjoyment of life, and financial damages, some or all of which may be permanent.

**5. Plaintiff Faustino Martinez Lobato v. Defendants Clay Forcey and Christopher Pasquale**

189. Plaintiff Faustino Martinez Lobato is a Latino man who at all times relevant hereto resided in Gardners, Pennsylvania, which is located in Adams County.

190. Defendant Clay Forcey was, at all times relevant hereto, employed by PSP as a state trooper.

191. Defendant Christopher Pasquale was, at all times relevant hereto, employed by PSP as a state trooper.

192. Early on the morning of October 10, 2018, Mr. Martinez Lobato was driving his minivan east on Route 234 in Adams County. His niece sat next to him in the front passenger seat.

193. As Mr. Martinez Lobato made a left hand turn into a Rutter's gas station, a speeding vehicle struck the passenger side of Mr. Martinez Lobato's minivan.

194.    The collision badly damaged the minivan, but Mr. Martinez Lobato managed to maneuver it off Route 234 and into the gas station parking lot. The driver of the other vehicle also pulled into the gas station parking lot.

195.    Mr. Martinez Lobato and the driver briefly spoke. A language barrier made communication difficult, but Mr. Martinez Lobato understood that the driver had called the police for help.

196.    Realizing he needed language assistance, Mr. Martinez Lobato called his bilingual friends, who agreed to come to the accident scene.

197.    Approximately fifteen minutes later, an ambulance arrived. An Emergency Medical Technician (EMT) began examining the driver of the other vehicle.

198.    About fifteen minutes after the ambulance arrived, Defendants Forcey and Pasquale arrived.

199.    They walked over to Mr. Martinez Lobato and asked for his license. Although Mr. Martinez Lobato has limited proficiency in English, he understood they wanted identification.

200.    Mr. Martinez Lobato walked back to his minivan with Defendants Forcey and Pasquale and gave them his passport, along with his vehicle registration and car insurance.

201.   Defendants Forcey and Pasquale did not question Mr. Martinez Lobato about the car accident.

202.   Instead, they left him and walked over to talk to the driver of the other vehicle, while the EMT waved Mr. Martinez Lobato and his niece over to the ambulance.

203.   Mr. Martinez Lobato's friends arrived while the EMT was taking his blood pressure.

204.   Mr. Martinez Lobato explained to his friends in Spanish that he wanted to leave, so they asked the EMTs whether he could leave. The EMT said that Mr. Martinez Lobato and his niece were not free to leave until the troopers said they were "good to go."

205.   After the EMT finished her examination, Mr. Martinez Lobato waited with his friends by his side. While they were waiting, he described what happened, including how the vehicle that had struck him had just exited from the Route 15 off ramp and was traveling very fast.

206.   About 10 minutes after the EMT finished examining Mr. Martinez Lobato, the EMT told him that he and his niece could leave.

207.   As Mr. Martinez Lobato and his niece prepared to leave with their friends, Defendants Pasquale and Forcey stepped in front of them, blocking their exit.

208.    Defendant Forcey asked, "how did these people get here?" and then asked Mr. Martinez Lobato's friends if they drove there.

209.    Defendant Forcey told Mr. Martinez Lobato's friends that while they could leave, Mr. Martinez Lobato could not leave pending an immigration investigation. Defendant Forcey said, "immigration wanted to talk to him."

210.    Defendants Forcey and Pasquale arrested Mr. Martinez Lobato without the requisite probable cause. The immigration checks run by ICE at Defendant Forcey's request had "yielded negative results," which meant that there was no probable cause to believe Mr. Martinez Lobato was subject to removal. The only information Defendants Forcey and Pasquale – and ICE – had at the time was Mr. Martinez Lobato's passport, which does not, by itself, establish removability.

211.    Despite not having probable cause to justify Mr. Martinez Lobato's arrest, Defendant Forcey nonetheless handcuffed him and transported him to the PSP Gettysburg barracks. Defendant Forcey refused to allow Mr. Martinez Lobato's bilingual friend to accompany him.

212.    Mr. Martinez Lobato remained handcuffed at the police barracks until an ICE officer arrived, which was approximately an hour later.

213. The ICE officer processed Mr. Martinez Lobato and brought him to York County Prison, where he was placed into removal proceedings. Mr. Martinez Lobato was released on a bond set by an immigration judge.

214. As a result of the unlawful conduct described in the foregoing paragraphs, Mr. Martinez Lobato suffered substantial damages including emotional trauma and distress, loss of enjoyment of life, and financial damages, some or all of which may be permanent.

### d. PSP Supervisors Knew About the Increased Civil Immigration Enforcement and Discriminatory Activities of Troopers and Failed to Remedy the Unlawful Conduct

215. PSP supervisory officials—including Commissioner Robert Evanchick, Acting Deputy Commissioner of Operations James Degnan, and Director of Basic Training Linette Quinn—have known since early 2017 that PSP troopers, including Defendant Macke, were engaged in a pattern and practice of stops and/or detentions of Latino individuals on the basis of their perceived race, color, ethnicity, or national origin for the purpose of unlawfully enforcing federal civil immigration law.

216. These PSP supervisors were appropriate persons to remedy the discriminatory conduct.

217. PSP supervisors knew of the increased civil immigration enforcement activity by some of their troopers since early 2017, yet were deliberately

indifferent to the pattern and practice of illegal conduct by failing to take reasonable and necessary measures to curtail the problem.

218.    On February 25, 2019, Commissioner Evanchick testified before a Pennsylvania House Appropriations Committee budget hearing that, "[a]bout a year and a half, two years ago, it was brought to our attention that we did have some people who were stopping individuals that were kind of creating an issue for us." The context in which he made the comment makes plain that Commissioner Evanchick was speaking about civil immigration enforcement.

219.    On March 20, 2019, before a Pennsylvania House Judiciary Committee Hearing, Acting Deputy Commissioner of Operations James Degnan acknowledged the correlation between increased federal immigration enforcement activity and increased PSP immigration activity when he testified that, "I think the landscape on immigration has changed sir, on a federal level and it has driven, again, most of the states to have to take a look at how they address it."

220.    In June 2017, several community and immigrant rights group members met with Quinn. At the time, Quinn was one of the top command staff for Troop H, the regional designation for PSP troopers working in five counties, including the Carlisle barracks, where Defendants Macke, Ronk, and Manning worked. The community members complained to Quinn that troopers were engaging in discriminatory stops and/or detentions of Latino community members

based upon perceived race, color, ethnicity, or national origin for the purpose of unilateral civil immigration enforcement. They provided Quinn with specific examples of the immigration enforcement activity, including bringing a victim to share his story.

221. Quinn acknowledged the complained-about practices, but instead of acknowledging them as unlawful, attempted to justify the practices. She told the community members that it was a long-standing PSP practice across Pennsylvania to detain people who a PSP trooper suspects of violating federal civil immigration law.

222. Further, in an April 2018 ProPublica article, PSP spokesperson Ryan Tarkowski acknowledged the existence of these practices.

223. PSP has a duty to train troopers about the legal scope of their powers to stop, detain, and arrest civilians. Under both Title VI and the U.S. Constitution, that duty includes training PSP troopers to abide by federal-law limits on their authority, including limits on civil immigration law enforcement.

224. PSP also has a duty not to be deliberately indifferent to illegal discrimination when troopers are impermissibly using race, color, ethnicity, or national origin as a basis to stop and/or detain an individual.

225. Since September 2009, PSP has had a policy against bias-based profiling ("anti-bias policy"), which it defines as disparate treatment of any person

on the basis of their racial or ethnic status rather than on the basis of reasonable suspicion.

226.   PSP did not, however, require troopers to record or report the suspected race or ethnicity of the people they pulled over or detained, effectively preventing any meaningful enforcement of the agency's anti-bias policy.

227.   Consistent with their failure to properly implement PSP's anti-bias policy and ensure compliance with federal law and the U.S. Constitution, PSP leadership allowed troopers to continue to profile individuals for the illegal purpose of civil immigration enforcement.

228.   PSP did not have a policy regulating troopers' immigration-law-enforcement activities during the time of any of the incidents referenced in this complaint.

229.   Indeed, PSP did not adopt a policy on immigration stops until late January 2019, nearly two years after PSP officials knew of the increased and unlawful immigration enforcement by their troopers.

230.   Moreover, at no time during the course of the incidents described in this complaint did PSP require troopers to record or in any way memorialize their immigration-enforcement activities, including contacts with and requests for assistance to ICE.

231.   Nor did PSP provide its troopers with any training or written guidance on the limits of their authority to enforce federal civil immigration laws at the time of the incidents at issue in this lawsuit.

232.   Upon information and belief, PSP leadership also failed to take meaningful disciplinary action against troopers who repeatedly engaged in discriminatory stops and civil immigration enforcement activities. For instance, upon information and belief, Defendant Macke was not disciplined for his repeated misconduct.

233.   In short, PSP officials were deliberately indifferent to the pattern and practice of profiling and illegally prolonged detention for the purpose of unlawful civil immigration enforcement.

## V.    CLAIMS FOR RELIEF

### COUNT I
### TITLE VI – RACE, COLOR, AND NATIONAL ORIGIN DISCRIMINATION
**All Plaintiffs v. Defendant Commonwealth of Pennsylvania**

234.   Paragraphs 1 through 234 are incorporated by reference as if pled herein.

235.   The Commonwealth of Pennsylvania and its agency, the PSP, are public entities that receive federal financial assistance.

236.   Troopers Macke, Doe, Forcey, Manning, Ronk, Pasquale, and Patrone were acting on behalf of PSP, an agency of the Commonwealth, when they

discriminated against the Plaintiffs by detaining them based on their perceived race, color, ethnicity, or national origin.

237. The Commonwealth acted with deliberate indifference to the risk and knowledge that PSP troopers were discriminating on the basis of perceived race, color, ethnicity, or national origin.

238. Because supervisory officials, including Acting Commissioner Evanchick, Acting Deputy Commissioner Degnan, and Director of Basic Training Quinn were the appropriate persons to address or remedy the above-named troopers' discriminatory conduct, the Commonwealth of Pennsylvania is liable to the Plaintiffs for damages under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

## COUNT II
### VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS – UNREASONABLE SEIZURE (UNILATERAL CIVIL IMMIGRATION LAW ENFORCEMENT)
**Plaintiffs Marquez, Cambar Matute, and Lovos Marquez v. Defendant Luke Macke;**
**Plaintiffs Gonzalez Olvera and Garcia v. Defendants Patrone and Doe; and**
**Plaintiffs Castaneda Morales and Lopez Castro v. Defendants Ronk and Manning**

239. Paragraphs 1 through 238 are incorporated by reference as if pled herein.

240. Defendants Macke, Patrone, Doe, Ronk and Manning detained the Plaintiffs Cambar Matute, Lovos Marquez, Gonzalez Olvera, Garcia, Castaneda

Morales, and Lopez Castro without any lawful justification and solely on the basis of their belief that they were unlawfully present in the United States.

241.   Defendants Macke, Patrone, Doe, Ronk and Manning did not have authority to detain the above-named Plaintiffs based on suspected removability without any request or direction from the federal government. By prolonging the detention of the above-named Plaintiffs based on a unilateral determination of suspected civil immigration violation, Defendants Macke, Patrone, Doe, Ronk and Manning violated the above-named Plaintiffs' Fourth Amendment rights, as applied to the states by the Fourteenth Amendment, to be free from unreasonable seizures.

242.   It was clearly established at the time of the above-named Plaintiffs' seizures that it was unlawful for Defendants to unilaterally seize individuals for civil immigration violations.

243.   The above-named Plaintiffs suffered loss of their fundamental rights and liberty as a result of the Defendants' actions.

244.   As such, Defendants Macke, Patrone, Doe, Ronk, and Manning, are liable to the above-named Plaintiffs for damages under 42 U.S.C. § 1983.

245.   The above-named Plaintiffs are entitled to punitive damages, as the actions of Defendants Macke, Patrone, Doe, Ronk, and Manning were motivated

by evil motive or intent and/or involved reckless or callous indifference to the Plaintiffs' rights.

**COUNT III**
**VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS –**
**UNREASONABLE SEIZURE (WITHOUT PROBABLE CAUSE)**

**Plaintiffs Marquez, Cambar Matute, Lovos Marquez, Castro, Amaya Castellanos v. Defendant Luke Macke**

**Plaintiffs Gonzalez Olvera and Garcia v. Defendants Patrone and Doe**

**Plaintiffs Castaneda Morales and Lopez Castro v. Defendants Ronk and Manning**

**Plaintiff Martinez Lobato v. Defendants Forcey and Pasquale**

246. Paragraphs 1 through 245 are incorporated by reference as if pled herein.

247. By prolonging the Plaintiffs' detention based on a request from ICE without probable cause, Defendants violated the Plaintiffs' Fourth Amendment right to be free from unreasonable seizures.

248. These unconstitutional stops and arrests violated clearly-established law. Plaintiffs suffered loss of fundamental rights and their liberty as a result of the actions by Defendants.

249. Plaintiffs are entitled to punitive damages, as the actions of the Defendants were motivated by evil motive or intent and/or involved reckless or callous indifference to Plaintiffs' rights.

## COUNT IV
## UNLAWFUL DISCRIMINATION – FOURTEENTH AMENDMENT

**Plaintiffs Marquez, Cambar Matute, Lovos Marquez, Castro, Amaya Castellanos v. Defendant Luke Macke**

**Plaintiffs Gonzalez Olvera and Garcia v. Defendants Patrone and Doe**

**Plaintiffs Castaneda Morales and Lopez Castro v. Defendants Ronk and Manning**

**Plaintiff Martinez Lobato v. Defendants Forcey and Pasquale**

250.    Paragraphs 1 through 249 are incorporated by reference as if pled herein.

251.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees all persons equal protection of the law.

252.    As Latinos, Plaintiffs Marquez, Cambar Matute, Lovos Marquez, Castro, Amaya Castellanos, Gonzalez Olvera, Garcia, Castaneda Morales, Lopez Castro, and Martinez Lobato are members of a protected class.

253.    Defendants Macke, Patrone, Doe, Ronk, Manning, Forcey and Pasquale, acting under color of law and in the performance of their official duties, engaged in profiling of and discrimination against the above-named Plaintiffs based on their perceived race, color, ethnicity, or national origin.

254.    By stopping and detaining the above-named Plaintiffs based on their perceived race, color, ethnicity, or national origin, Defendants Macke, Patrone, Doe, Ronk, Manning, Forcey and Pasquale intentionally and unlawfully

discriminated against the Plaintiffs on account of their perceived race, color, ethnicity, or national origin.

255.   Defendants Macke, Patrone, Doe, Ronk, Manning, Forcey and Pasquale violated Plaintiffs' clearly established right to equal protection.

256.   As a result of the Defendants' actions, Plaintiffs suffered loss of their fundamental rights and liberty.

257.   As such, Defendants Macke, Patrone, Doe, Ronk, Manning, Forcey and Pasquale are liable to the Plaintiffs for damages under 42 U.S.C. § 1983.

258.   Because the Defendants' actions were motivated by evil motive or intent and/or involved reckless or callous indifference to the Plaintiffs' rights, Plaintiffs are also entitled to punitive damages.

## REQUESTED RELIEF

**WHEREFORE**, Plaintiffs Maria Marquez, Eduin Arturo Cambar Matute, Milton Francisco Lovos Marquez, Andres Gonzalez Olvera, Jorge Alberto Garcia, Rebecca Castro, Carlos Amaya Castellanos, Roberto Castaneda Morales, Bernabe Lopez Castro, and Faustino Martinez Lobato respectfully request:

A.   Actual and compensatory damages sufficient to make them whole;

B.     Punitive damages against Defendants Doe, Forcey, Macke, Manning, Pasquale, Patrone, and Ronk to punish them and deter further wrongdoing;

C.     Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable law; and

D.     Such other and further relief as may appear just and appropriate.

/s/ Kathryn E. Deal
Kathryn E. Deal*
    PA ID. No. 93891
Mira Baylson*
    PA ID. No. 209559
Ellen L. Pierce*
    PA ID. No. 318579
Jonathan Aronchick*
    PA. ID. No. 321244
AKIN GUMP STRAUSS HAUER &
    FELD LLP
Two Commerce Square
2001 Market Street, Suite 4100
Philadelphia, PA 19103
Telephone: 215.965.1200
kdeal@akingump.com
mbaylson@akingump.com
epierce@akingump.com
jaronchick@akingump.com

/s/ Witold J. Walczak
Witold J. Walczak
    PA ID. No. 62976
Vanessa L. Stine
    PA ID. No. 319569
AMERICAN CIVIL LIBERTIES
    UNION OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
(215) 592-1513
vwalczak@aclupa.org
vstine@aclupa.org

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
    PA ID. No. 88227
KAIRYS, RUDOVSKY, MESSING,
    FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
215-925-4400
jfeinberg@krlawphila.com

_/s/ Seth F. Kreimer_
Seth F. Kreimer
  PA. ID. No. 26102
3501 Sansom Street
Philadelphia, PA 19104
(215) 898-7447
skreimer@law.upenn.edu

*Admitted _Pro Hac Vice_